John W. Dillon (CA Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
(760) 642-7150
jdillon@dillonlawgp.com

Chad Flores (TX Bar. No 24059769)
Flores Law PLLC
917 Franklin Street
Suite 600
Houston, Texas 77002
(713) 364-6640
cf@chadflores.law

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> COAST RUNNER INDUSTRIES, INC., GHOST GUNNER, INC., and DEFENSE DISTRIBUTED, <br><br> Defendants. | Case No. 3:24-cv-00971 <br><br> **Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss** <br><br> Date: October 17, 2024 <br><br> Time: 2:00 pm <br><br> Judge: Hon. Anthony J. Battaglia <br> Mag. Judge: Hon. Steve B. Chu <br> Courtroom 4A |

# **Table of Contents**

Table of Contents ........................................................................................ ii

Table of Authorities ................................................................................... iii

Motion to Dismiss .......................................................................................1

I.     The Court lacks personal jurisdiction. ...............................................1

      A.     General personal jurisdiction does not exist. ........................................1

      B.     Specific personal jurisdiction does not exist. ........................................2

II.     The complaint fails to state a claim upon which relief can be granted. ..........9

      A.     AB 1621 and AB 1089 are unconstitutional. ......................................10

          1.     The Second Amendment's protections are implicated. ............11

          2.     The state cannot show the requisite historical tradition. ..........12

      B.     The alter ego allegations do not suffice. .............................................18

III.     The Court should award Defendants their attorney's fees. ...........................21

Conclusion.................................................................................................23

## Cases

*Andrews v. State*,
    50 Tenn. 165 (1871) ................................................................................. 11, 12

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ................................................................................. 6

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ................................................................................. 1

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................................. 10, 11

*Durham v. Accardi*,
    587 S.W.3d 179 (Tex. App.—Houston [14th Dist.] 2019, no pet.). ....... 19, 20

*Eli Lilly & Co. v. Nang Kuang Pharm. Co., Ltd.*, No. 1:14-CV-01647-TWP,
    2015 WL 3744557 (S.D. Ind. June 15, 2015) ................................................. 7

*Endsley Elec., Inc. v. Altech, Inc.*,
    378 S.W.3d 15 (Tex. App.—Texarkana 2012, no pet.) ................................. 20

*Estate of Martinez v. Yavorcik*,
    455 F. Supp. 2d 115 (D. Conn. 2006) ........................................................... 7

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ......................................................................... 11

*Hanson v. Denckla*,
    357 U.S. 235 (1958) ....................................................................................... 6

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ....................................................................................... 6

*Home Gambling Network, Inc. v. Betinternet.com*, No. 2:05CV-610,
    2006 WL 1795554 (D. Nev. June 26, 2006) ................................................. 7

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945) ............................................................................ 6

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014) ............................................... 12

*JNM Express, LLC v. Lozano*,
  688 S.W.3d 327 (Tex. 2024) ............................................................. 18

*Koninklijke Philips N.V. v. Digital Works, Inc.*, No. 2:13-CV-0134,
  2014 WL 3816395 (D. Nev. Aug. 4, 2014) ....................................... 7

*Lucas v. Tex. Indus., Inc.*,
  696 S.W.2d 372 (Tex. 1984) ............................................................. 19

*Luis v. United States*,
  578 U.S. 5 (2016) ............................................................................ 11

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
  647 F.3d 1218 (9th Cir. 2011) .......................................................... 8

*McDonald v. Chicago*,
  561 U.S. 742 (2010) ........................................................................ 10

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ........................................................... 12

*New York State Rifle & Pistol Association, v. Bruen*,
  142 S.Ct. 2111 (2022) ............................................................*passim*

*Oregon Clinic, PC v. Fireman's Fund Ins. Co.*,
  75 F.4th 1064 (9th Cir. 2023) ....................................................... 2, 3

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progres*s,
  890 F.3d 828 (9th Cir. 2018) ......................................................... 21

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
  275 S.W.3d 444 (Tex. 2008) ........................................................... 18

Defendant's Memorandum of Points and Authorities in Support of
Defendants' Motion to Dismiss

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2000)....................................................................10

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ....................................................................13

*Walden v. Fiore*,
    571 U.S. 277 (2014).....................................................................*passim*

*Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*,
    24 F.3d 56 (9th Cir. 1994)..........................................................................10

*Winsor v. Sequoia Benefits & Ins. Services, LLC*,
    62 F.4th 517 (9th Cir. 2023) ...................................................................2, 3

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)...............................................................................5, 6

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997) ............................................................8

**Statutes**

Cal. Civ. Code § 3273.62 .................................................................................11

Cal. Civ. Proc. Code § 425.16........................................................................21

Cal. Penal Code § 29185 ................................................................................11

**Rules**

Fed. R. Civ. P. 12(b)(1)......................................................................................1

Fed. R. Civ. P. 12(b)(6).....................................................................................9

**Secondary Authorities**

M.L. Brown,
    Firearms in Colonial America: The Impact on History and Technology
    1492-1792 (1980)....................................................................................14

John G.W. Dillin,
  The Kentucky Rifle (1975) ..........................................................................15

Sohaib Jabran et al.,
  Functional Reverse Engineering of Strategic and Non-Strategic
  Machine Tools (Wasim Ahmed Khan et. al. eds., 1st ed. 2021)...................16

Joseph G.S. Greenlee,
  The American Tradition of Self-Made Arms, 54 St. Mary's L.J. 35
  (2023) ...............................................................................................*passim*

David A. Hounshell,
  From the American System to Mass Production, 1800-1932 (1984) ...........16

Lindsay Schakenbach Regele,
  Industrial Manifest Destiny: American Firearms Manufacturing and
  Antebellum Expansion, 92 Bus. Hist. Rev. 57 (2018)..................................15

Charles Winthrop Sawyer,
  Firearms in American History (1910)......................................................13, 14

Francis Newton Thorpe,
  The Federal and State Constitutions, Colonial  Charters, and Other
  Organic Laws of the States, Territories, and  Colonies Now or
  Heretofore Forming the United States of America (Francis Newton
  Thorpe ed., 1909) ..........................................................................................13

James B. Whisker,
  The Gunsmith's Trade (1992)............................................................... 14, 17

The Writings of Thomas Jefferson (Paul Ford ed., 1904)......................................14

**Motion to Dismiss**

Defendants move to dismiss this action in the alternative, if and only if the Court does not grant the Defendants' separately-filed motion to transfer this action to the Western District of Texas. If the Court retains the case, it should dismiss the action for lack of personal jurisdiction and/or for failure to state a claim on which relief can be granted, and should also award the Defendants their attorney's fees.

## I. The Court lacks personal jurisdiction.

If the Court does not transfer this action to Texas, Defendants move to dismiss the action against them for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Though Plaintiffs bear the burden of pleading facts that establish personal jurisdiction, the complaint fails to do so. As a matter of law on this complaint, all three Defendants deserve dismissal for lack of personal jurisdiction.

### A. General personal jurisdiction does not exist.

General personal jurisdiction exists only if a defendant's forum contacts are so "continuous and systematic" that it can said to be "at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). No serious case for general jurisdiction can be made here because the Defendants are at home only in Texas. The complaint essentially concedes this by acknowledging that all of the Defendants are at home in Texas. *See* Doc. 1-8 at 6-7.

**B. Specific personal jurisdiction does not exist.**

Specific personal jurisdiction exists only if the action arises out of conduct that constitutes a defendant's purposeful availment of the forum itself. *E.g.*, *Walden v. Fiore*, 571 U.S. 277, 284 (2014). That test is not met here as to any defendant.

Specific personal jurisdiction is clearly absent as to Defendants Ghost Gunner Inc., and Defense Distributed. Though Paragraphs 16 and 17 make allegations about their California contacts, *see* Doc. 1-8 at 23-24, these allegations are conclusory—because they are totally generalized, without any meaningful detail—and therefore do not count, *see, e.g.*, *Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023) (allegations that lack the "*how*" explanation are conclusory); *Winsor v. Sequoia Benefits & Ins. Services, LLC*, 62 F.4th 517, 524 (9th Cir. 2023) (allegations that are "general in nature" do not count).

Besides that insufficient lip service, the complaint never alleges that these two defendants did anything in California. Though there are allegations about these two defendants abusing the corporate form of the other defendant (Coast Runner, Inc.), those allegations are not about California. They pertain only to Texas-based conduct concerning the internal affairs of businesses organized under Texas law. *See* Doc. 1-8 at 6-7. To the extent that any of these matters of corporate form constitute "minimum contacts," they constitute contacts only with Texas—not California.

Specific personal jurisdiction is also absent as to Defendant Coast Runner, Inc. (and by extension as to the other defendants if they are somehow implicated by everything Coast Runner Inc. did). The paragraph 15 allegations about Coast Runner, Inc.'s California contacts are conclusory—because they are totally generalized, without any meaningful detail, *see* Doc. 1-8 at 23-24— and therefore do not count towards the requisite minimum contacts. *See, e.g.*, *Oregon Clinic, PC*, 75 F.4th at 1073; *Winsor*, 62 F.4th at 524. Besides those, the complaint's basis for exercising specific personal jurisdiction over Coast Runner, Inc. is that Californians will choose to do business with it in the future because of a website broadcasting worldwide. This effort violates two of the key rules upheld by the Supreme Court in *Walden*.

First, *Walden* makes specific jurisdiction over Coast Runner, Inc. impossible to sustain here by reaffirming a longstanding rule about whose contacts matter: Contacts count towards purposeful availment only if they are created by the "defendant himself"—not if they are created by "plaintiffs or third parties." *Walden*, 571 U.S. at 284. The complaint's jurisdictional theory violates this rule because the only California connections it can muster are attributable to third parties—the Californians that allegedly choose to engage in the conduct at issue. Jurisdictionally, the Defendants did not reach out to anyone in California. Californians are supposedly going to reach out to Texas, which under *Walden* is not enough.

Second, *Walden* makes specific jurisdiction impossible to sustain here by holding that "'minimum contacts' analysis looks to the defendant's contacts with *the forum State itself*, not the defendant's contacts with *persons who reside there*.'" *Walden*, 571 U.S. at 285. Whatever relationship the Defendants have created here is with California residents themselves—not their state. Under *Walden*, the critical jurisdictional question is about "whether the defendant's actions connect him to the forum." *Id.* For all of this action's Defendants, the answer is "no."

In each of these respects, Plaintiffs' suit tries to do precisely what *Walden* disallowed. It tries to establish specific jurisdiction with something other than "contacts that the 'defendant himself' creates"; and it contradicts the rule that "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 284–85. The Defendants can be only be sued at home, in Texas, which is precisely where they have asked for the case to be transferred.

There is also a third independent reason to reject specific jurisdiction here: Most of the contacts that supposedly constitute purposeful availment have not occurred. The suit is not really about business that is occurring *now*. For indeed, not one unit of Coast Runner's product has ever been sold into the territory of the United States District Court for the Southern District of California. The complaint cannot allege any actual shipments to this jurisdiction because none have ever

occurred.  The suit is really about business that Plaintiffs predict Defendants will carry on in the future.  If specific jurisdiction could ever be sustained on that basis, it would become legitimate only if and when the Defendants actually engage in the course of conduct that the Plaintiff predicts that they will take part in later.  But because they have not done so, specific jurisdiction does not exist *yet*.

The need for actual acts of purposeful availment is not just an unspoken assumption. It lies at the heart of what the Supreme Court repeatedly holds. "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Walden*, 571 U.S. at 284.  Once personal jurisdiction attaches, the use of flexible procedural devices like injunctions about predicted future conduct can be sometimes proper.  But at inception—when courts are determining whether jurisdiction exists in the first place—the Due Process Clause's stricter demands limit the inquiry to an examination of conduct that has actually occurred in fact. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) 291–92 ("The concept of minimum contacts . . . acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.").

Accordingly, when precedent speaks of what constitutes true purposeful availment, it always does so in either the present or past tense. Never does is speak of future, hypothetical conduct as sufficing. This was true in *International Shoe* itself, *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) ("due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he *have* certain minimum contacts . . ." (emphasis added)), and has remained true ever since, *see, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily *assumed*" (emphasis added)); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) ("due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there *are* sufficient contacts between the State and the foreign corporation" (emphasis added)); *World-Wide Volkswagen Corp.*, 444 U.S. at 295 ("we find in the record before us a total absence of those affiliating *circumstances that are a necessary predicate* to any exercise of state-court jurisdiction" (emphasis added)); *Hanson v. Denckla*, 357 U.S. 235, 251 (1958) ("a defendant may not be called upon to do so unless he *has had* the 'minimal contacts' with that State that are

a prerequisite to its exercise of power over him" (emphasis added)).  Precedent from other courts consistently supports this rule as well.[1]

Hence, unless and until a person actually engages in conduct that constitutes "purposeful availment" of the forum, their liberty interest in being free from unwarranted adjudication remains.  For non-residents that have not in fact availed themselves of a forum, plaintiffs cannot be allowed to feign their way into an exercise of jurisdiction by alleging that the non-resident is sure to do so in the future.  If that does not disable the case as a matter of "minimum contacts," then it must constitute the kind of suit that offends "traditional notions of fair play and substantial justice."  *Int'l Shoe,* 326 U.S. at 319 (1945) ("[The Due Process Clause] does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.").

---

[1] *See Estate of Martinez v. Yavorcik*, 455 F. Supp. 2d 115, 121 n.3 (D. Conn. 2006) ("[P]romises as to future conduct cannot establish personal jurisdiction."); *Home Gambling Network, Inc. v. Betinternet.com, PLC,* 2:05CV-610, 2006 WL 1795554, at *5 (D. Nev. June 26, 2006) ("Jurisdiction is not based on the likelihood of some future contact with the forum, but 'the defendant's conduct and connection with the forum state . . . such that he should reasonably anticipate being haled into court there.'" (omission in original) (quoting *World-Wide Volkswagen Corp.*, 444 U.S. 286)); *Eli Lilly & Co. v. Nang Kuang Pharm. Co., Ltd.*, No. 1:14-CV-01647-TWP, 2015 WL 3744557, at *1 (S.D. Ind. June 15, 2015) ("[P]ersonal jurisdiction cannot be based on future contacts, even if such contacts are allegedly 'inevitable.'" (quoting *Sys. Software Assocs., Inc. v. Trapp*, No. 95 C 3874, 1995 WL 506058, at *6 (N.D. Ill. Aug.18, 1995)); *Koninklijke Philips N.V. v. Digital Works, Inc.*, 2:13-CV-01341-JAD, 2014 WL 3816395, at *3 (D. Nev. Aug. 4, 2014) (no personal jurisdiction where plaintiffs did "not demonstrate[] that Diaz has had any contacts with Nevada; their jurisdictional basis is one of potential future contacts only").

At bottom, the complaint's case for specific personal jurisdiction over Coast Runner, Inc. rests on little more than the business's maintenance of a website passively offering products to the entire world that happens to also broadcast into California. That does not suffice because "maintenance of a passive website alone cannot satisfy the express aiming prong." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011). Everything else the complaint focuses on to state its claims happened outside of California, lacking any of the "purposeful direction" to this forum that precedent requires. *See id.*; *see also Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

For these reasons, the complaint's pleadings fail to establish that the Defendants' relationship with California crosses the threshold necessary to warrant an exercise specific jurisdiction. With general jurisdiction clearly lacking as well, the case as to all three Defendants should be dismissed.

## II. The complaint fails to state a claim upon which relief can be granted.

If the Court does not transfer this action to Texas and if personal jurisdiction exists, Defendants move to dismiss the action for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

At issue are the California firearm laws referred to as AB 1621 and AB 1089. *See* Doc. 1-8 at 24-26 (Count I); *id.* at 26-28 (Count II). AB 1621 is codified as California Penal Code Section 29185. Plaintiffs say that it "generally makes it unlawful to sell or market a CNC milling machine that 'has the sole or primary function of manufacturing firearms.'" Doc. 1-8 at 3. AB 1089 is codified as California Civil Code Section 3273.62. Plaintiffs say that it "generally makes it unlawful to sell or market a CNC milling machine in a manner that "is targeted at purchasers seeking to manufacture firearms or that otherwise affirmatively promotes' the machine's 'utility in manufacturing firearms.'" Doc. 1-8 at 3-4.

Both of the complaint's claims rely squarely upon AB 1621 and AB 1089. Claim 1 alleges that the Defendants violate AB 1089 by causing customers to violate AB 1621. Doc. 1-8 at 24-26 (Count I). Claim 2 alleges that those supposed violations of AB 1089 and AB 1621 necessarily also constitute violations of California's Unfair Competition Law. Doc. 1-8 at 26-28 (Count I). To obtain any relief on these claims, AB 1621 and AB 1089 have to be constitutional and the Defendants have to have violated them. But neither is true, so no relief is possible.

**A.    AB 1621 and AB 1089 are unconstitutional.**

First, the Court should dismiss this action for failure to state a claim upon which relief can be granted because enforcing AB 1621 and AB 1089 against the Defendants violates the Second Amendment.  Both facially and as applied here, no relief under can be had under either law individually or under both laws together.[2]

The Second Amendment forbids laws abridging the individual right to keep and bear Arms, *see District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), and applies to AB 1621 and AB 1089 by virtue of the Fourteenth Amendment, *see McDonald v. Chicago*, 561 U.S. 742 (2010).  Where "the Second Amendment's plain text covers an individual's conduct," the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association, v. Bruen*, 142 S.Ct. 2111 (2022).  That test applies to AB 1621 and AB 1089 and cannot be met because both laws are clearly inconsistent with this Nation's historical tradition of firearm regulation.  Thus, as a

---

[2] Defendants can assert both their own constitutional rights and those of their customers. *See Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61 (9th Cir. 1994) ("It is well settled that a provider of goods or services has standing to challenge government regulations that directly affect its customers and restrict its market."); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015-16 (9th Cir. 2000) (holding that a party has standing to challenge constitutionality of statute where "a credible threat of prosecution . . . is clearly traceable" to the challenged statute "and can be redressed through an injunction enjoining enforcement of that provision.").

matter of law based on pleadings alone, the Plaintiffs' attempted enforcement of AB 1621 and AB 1089 against Defendants violates the Second Amendment.

### 1. The Second Amendment's protections are implicated.

As to the initial issue of constitutional text, the Second Amendment's operative words cover what AB 1621 and AB 1089 proscribe. The Second Amendment's term "Arms" covers "all instruments that constitute bearable arms," including "those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. AB 1621 and AB 1089 plainly regulate such "Arms" by acting upon any "firearm." *See* Cal. Penal Code § 29185 (governing "a firearm" and "firearms"); Cal. Civ. Code § 3273.62 (governing "firearms").

The activities that AB 1621 and AB 1089 proscribe are also covered by the Second Amendment phrase "keep and bear," which necessarily entails an individual right to make or acquire Arms. *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency

for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair"); *see also Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ( "the right to keep and bear arms . . . must also include the right to *acquire* a firearm . . ." (emphasis in original)).

To make the position clear, Defendants' point is *not* that these activities lack a textual hook *and are protected anyhow*.  The point is that the requisite textual hook exists because the Second Amendment phrase "keep and bear Arms" necessarily entails acquiring and/or making personal firearms.  Just as a law criminalizing printing presses would implicate the First Amendment, so too does the criminalization of personal gunsmithing implicate the Second—especially in light of a historical legal tradition that has long kept personal firearm manufacturing free of anything like AB 1621 and AB 1089's restrictions.

## 2. The state cannot show the requisite historical tradition.

Because the firearm regulations of AB 1621 and AB 1089 implicate the Second Amendment's protections, Plaintiffs have the burden of demonstrating requisite historical tradition supporting these laws; it is not the Defendants' burden to disprove that historical tradition.  *See Bruen*, 142 S.Ct. 2111.  Even so, authorities

already make it clear that there is no historical tradition of regulating the self-manufacture of firearms that supports what AB 1621 and AB 1089 do.

Self-manufactured firearms in America have a long and, until just recently, unregulated history. *See* Joseph G.S. Greenlee, The American Tradition of Self-Made Arms, 54 St. Mary's L.J. 35, 66 (2023). "Private gunmaking is steeped in history and tradition, dating back to long before the Founding." *VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (Oldham, J., concurring), *cert. granted*, 144 S. Ct. 1390 (2024). "Millions of law-abiding Americans work on gun frames and receivers every year." *Id.* This is no new trend. It is a well-established tradition.

The unregulated self-manufacture of firearms was common in the American colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *See* Greenlee, *supra*, at 9. Colonists possessed both the express right to import whole firearms and the parts necessary to make their own firearms. *Id.* at 9-10 (citing Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3787–88 (Francis Newton Thorpe ed., 1909)). While "[i]n the large gunsmith shops of the cities it is probable that many many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or

without an apprentice did every part of the work."  Charles Winthrop Sawyer, Firearms in American History 145 (1910); *see also* James B. Whisker, The Gunsmith's Trade 5 (1992).

During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 127 (1980)).  Due to the circumstances of the war, "[n]early every able bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25.  "When the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void."  *Id.* at 16.  Indeed, the colonies themselves solicited firearm manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production.  *Id.* at 18–23.

Thomas Jefferson understood the right very well.  Describing the landscape of firearms in early America in 1793, he wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."  Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, *in* 7 The Writings of Thomas Jefferson 325–26 (Paul Ford ed., 1904).

After the Revolutionary War, "gunsmithing was a universal need in early America" and "many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a survival necessity. *Id.* at 32.

AB 1621 and AB 1089's supposedly modern notion of citizens making firearms with tools and preexisting parts is not modern at all. Although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, The Kentucky Rifle 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.*

CNC milling machines in particular are the modern-day manifestation of firearm milling technology—technology that has never before been regulated in American history. Firearm milling technology dates back to the early nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion, 92 Bus. Hist. Rev. 57, 64 (2018) (explaining that "Federal support of small arms manufacturing has been well documented," and that federal funds supported the development of the first firearm milling machine in the 1810s).

The earliest known milling machine originated at a factory operated by Simeon North, who had a contract with the War Department to manufacture firearms. David A. Hounshell, From the American System to Mass Production, 1800-1932 28–29 (1984). Beginning in 1820, John H. Hall, a cooper, cabinetmaker, and boatbuilder, improved upon North's milling machine, "develop[ing] three classes of milling machines, which he used to finish [firearm] parts." *Id.* at 39–41. Building on these innovations, John T. Parsons invented the first numerical control (NC) milling machine in the 1940s. Sohaib Jabran et al., Functional Reverse Engineering of Strategic and Non-Strategic Machine Tools 42 (Wasim Ahmed Khan et. al. eds., 1st ed. 2021).

This tradition of personal tooled gunmaking—free from any major regulation whatsoever—continued into the nineteenth and twentieth centuries, when "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." Greenlee, *supra*, at 35. Such innovations include "[t]he most popular rifle in America today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding." *Id.* at 39.

During all of these foundational time periods, anyone with the requisite skill had an essentially unfettered right to build their own firearms; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns."

Greenlee, *supra*, at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business….He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

Deviations from this historical tradition are decidedly few and modern. No restrictions were placed on the self manufacture of firearms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "[a]ll such restrictions have been enacted within the last decade." *Id.* At the state level, it was not until 2016 that a small minority of states began to regulate the manufacture of arms for personal use. *Id.* at 42.

Hence, there is no American historical tradition of regulating the self-manufacture of firearms in any significant respect—let alone proscribing it with the harsh penalties that AB 1621 and AB 1089 do. These laws therefore violate of the Second Amendment and cannot be enforced against Defendants in this action.

**B.    The alter ego allegations do not suffice.**

Assuming that all of the complaint's allegations are true, and assuming that AB 1621 and AB 1089 can ever be constitutionally enforced, the complaint fails to state a claim upon which relief can be granted against Defense Distributed and Ghost Gunner Inc. because neither of those Defendants took part in any of the allegedly wrongful conduct.    The only Defendant that the complaint makes pertinent allegations about is Coast Runner Industries, Inc.    The other two Defendants are implicated only by the slender reed of Plaintiffs' "alter ego" allegations.    As the argument goes, the latter defendants are 100% responsible for everything that Coast Runner Industries, Inc. does because "Coast Runner Industries, Inc. is merely an alter ego of Ghost Gunner Inc. and Defense Distributed."    Doc. 1-8 at 4.    But as a matter of law, the complaint does *not* allege what Texas law requires to pierce any corporate veil and establish such alter ego status.    So regardless of whether or not Coast Runner Industries, Inc. can be held liable for violating AB 1621 and AB 1089, Defense Distributed and Ghost Gunner Inc. cannot be deemed its "alter ego" and cannot bear the indirect responsibility this complaint tries to place upon them.

Texas law regarding "alter ego" status is well-established and strict.    *See, e.g.*, *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 335 (Tex. 2024).    It has "never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances."    *SSP Partners v. Gladstrong Invs. (USA)*

*Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). Instead, there "must be something more than mere unity of financial interest, ownership and control." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984).

"Alter ego is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately; the amount of financial interest, ownership, and control the individual maintains over the corporation; and whether the corporation has been used for personal purposes." *Durham v. Accardi*, 587 S.W.3d 179, 185 (Tex. App.—Houston [14th Dist.] 2019, no pet.). "Evidence that will support an alter ego finding includes (1) the payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) the diversion of company profits to the individual for the individual's personal use, (4) inadequate capitalization, and (5) any other failure to keep corporate and personal assets separate." *Id.* None of that has been pleaded here.

Under this strict legal test, Plaintiffs' complaint suffers from a woeful lack of sufficient alter ego allegations. The complaint's only significant basis for asserting alter ego status is the alleged overlapping presence of certain personnel. Yet no Texas precedent upholds an alter ego finding on such slim allegations. To the contrary, Texas courts have long held that an "individual's role as an officer, director,

or majority shareholder of an entity alone is not sufficient to support a finding of alter ego." *Id.* The Court should follow *Durham* here and deem the complaint's alter ego allegations insufficient as a matter of law

*Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 24 (Tex. App.—Texarkana 2012, no pet.), is another of the many controlling cases. Legally, it rightly upholds the rule that there "must be something more than mere unity of financial interest, ownership, and control for a court to treat an officer, director, or shareholder as the corporation's alter ego and make an officer, director, or shareholder liable for the corporation's actions." *Id.* at 25. Factually, it rightly concludes that shared personnel does not warrant an alter ego finding where, as here, "there is no evidence that [they] supported the project with personal funds, represented to anyone that they were personally backing [Coast Runner], commingled personal and company funds, manipulated or transferred [Coast Runner's] assets or liabilities, made loans to or from the company, prioritized themselves as creditors, or otherwise abused the corporate form." *Id.*

For these reasons, the Court should hold that the complaint's alter ego allegations fail to satisfy Texas law as to both Defense Distributed and Ghost Gunner Inc. So regardless of what happens to the case against Coast Runner Industries, Inc., the claims against the other two defendants should be immediately dismissed for failure to state a claim upon which relief can be granted.

**III.    The Court should award Defendants their attorney's fees.**

For each of the foregoing arguments, Defendants invoke not just Federal Rule of Civil Procedure 12, but also the provisions of California's anti-SLAPP law that apply in federal court.  *See* Cal. Civ. Proc. Code § 425.16.   In accordance with *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progres*s, 890 F.3d 828, 832 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018), Defendants hereby lodge a special motion to strike the complaint "based on alleged deficiencies in the plaintiff's complaint"—the deficiencies set forth above regarding a lack of personal jurisdiction and a failure to state a claim upon which relief can be granted.  *Id.*  These arguments "must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies."  *Id.*  Under that provision, "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs."  § 425.16(c)(1).

The only extra item to be established for this argument is that the anti-SLAPP statute applies, which is true as to any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." § 425.16(b)(1).  The complaint pleads directly into both the "right of petition" and "right of free speech" triggers with paragraphs 19 through 27, which show that the Plaintiffs bring this suit because of what Cody Wilson *advocates*

in speech and in litigation about the Constitutional rights involved. A leading example is Paragraph 22, which expressly pleads—and therefore impliedly asserts as *relevant* facts—that this action arises from the speech and petitioning efforts of Defense Distributed founder Cody Wilson:

> 22. For years, Wilson's stated goal has been to devise products that evade gun safety regulations, particularly those in California. For example, a 2016 Defense Distributed statement declared: "We are not blind to the impending threat [Hillary Clinton], *coming California legislation*, and the prohibitionists in the media pose to our modern rifles and to the Second Amendment. And we are not relaxing. Though we are proud of what we've been able to offer the people in the last two years with GG, *we know we must commit ourselves anew to the defense of our liberties and to offering you a machine that can last through prohibition and even the eventual breakup of this country*."[13]
>
> 23. Wilson and Defense Distributed also made a video directed "To California" that mocked California's legislative efforts to curb the manufacture and sale of certain gun parts.[14]
>
> 24. Wilson's attack on California regulations culminated in August 2022, when Defense Distributed filed a federal lawsuit challenging AB 1621, claiming the law violated Defense Distributed's purported Second Amendment right to sell its Ghost Gunner product.

Doc. 1-8 at 9. If that speech did not give rise to this action, the complaint would not have emphasized it.

The California anti-SLAPP statute therefore applies, and to the extent that the Court deems either of this motion's pleading-based arguments meritorious, it should enter an order that both dismisses the case *and* awards the Defendants their attorney's fees and costs under Section 425.16. Such order need not set the amount of those fees, which can be determined in subsequent motions practice.

Defendant's Memorandum of Points and Authorities in Support of
Defendants' Motion to Dismiss

**Conclusion**

If the Court does not transfer this action to the Western District of Texas, it should enter an order dismissing the action and awarding Defendants their attorney's fees and costs under Section 425.16.

June 17, 2024                              Respectfully submitted,

                                          Flores Law PLLC

                                          Attorneys for Defendants

                                          By: /s/ Chad Flores
                                                  Chad Flores